

**12-364-cv**
**Starbucks Corp. v. Wolfe's Borough Coffee, Inc.**

1    **UNITED STATES COURT OF APPEALS**
2    **FOR THE SECOND CIRCUIT**
3
4
5    August Term, 2012
6
7    (Argued: January 9, 2013        Decided: November 15, 2013)
8
9    Docket No. 12-364-cv

10
11    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
12
13    STARBUCKS CORPORATION, a Washington corporation,
14    STARBUCKS U.S. BRANDS LLC,
15
16            Plaintiffs-Counter-Defendants-Appellants,
17
18                v.
19
20    WOLFE'S BOROUGH COFFEE, INC., a New Hampshire
21    corporation, d/b/a BLACK BEAR MICRO ROASTERY,
22
23            Defendant-Counter-Claimant-Appellee.
24
25    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
26
27    Before: KATZMANN, Chief Judge, KEARSE and LOHIER, Circuit Judges.
28
29            This is an appeal by the plaintiffs from a decision of the United States
30    District Court for the Southern District of New York (Swain, J.) following a
31    second remand from this Court.  The District Court concluded that plaintiffs have
32    failed to prove that defendant's use of its "Mister Charbucks" and "Charbucks
33    Blend" marks is likely to dilute plaintiffs' famous "Starbucks" marks, and denied
34    injunctive relief.  We hold that the District Court did not clearly err in any of its
35    factual determinations, including its evaluation of the six non-exclusive factors
36    bearing on whether a mark is likely to cause dilution by blurring, enumerated in
37    the Federal Trademark Dilution Act of 1995, as amended by the Trademark

1  Dilution Revision Act of 2006.  <u>See</u> 15 U.S.C. § 1125(c)(2)(B)(i)–(vi).  Balancing
2  those factors <u>de</u> <u>novo</u>, we agree with the District Court that plaintiffs have failed
3  to demonstrate a likelihood of dilution by blurring.  Accordingly, we AFFIRM.

DAVID E. SIPIORA, Matthew Christian
Holohan, Kilpatrick Townsend & Stockton
LLP, Denver, CO, <u>for</u> Plaintiffs-Counter-
Defendants-Appellants.

JOHN-MARK TURNER, Christopher Cole,
Sheehan, Phinney, Bass + Green, P.A.,
Manchester, NH, <u>for</u> Defendant-Counter-
Claimant-Appellee.

LOHIER, <u>Circuit Judge</u>:

Starbucks Corporation and Starbucks U.S. Brands LLC (together,

"Starbucks") appeal from a judgment of the United States District Court for the

Southern District of New York (Swain, <u>J.</u>) denying Starbucks' request for an

injunction pursuant to the Federal Trademark Dilution Act of 1995 ("FTDA"), 15

U.S.C. § 1125(c), prohibiting Wolfe's Borough Coffee, Inc., doing business as

Black Bear Micro Roastery ("Black Bear"), from using Black Bear's "Mister

Charbucks," "Mr. Charbucks," and "Charbucks Blend" marks (the "Charbucks

Marks").  After a bench trial followed by additional briefing from the parties

upon remand from this Court, the District Court concluded that Starbucks failed

to prove that the Charbucks Marks are likely to dilute Starbucks' famous

"Starbucks" marks (the "Starbucks Marks") and denied Starbucks' request for an

injunction.

On appeal, Starbucks argues that the District Court erred in finding only

minimal similarity and weak evidence of actual association between the

Charbucks Marks and the Starbucks Marks.  Starbucks also contends that the

1    District Court erred in balancing the statutory dilution factors by giving no

2    weight at all to three of the factors—the strong distinctiveness, exclusive use, and

3    high degree of recognition of the Starbucks Marks—and placing undue weight on

4    the minimal similarity between the marks.

5          For the following reasons, we conclude that the District Court did not err

6    in its factual findings, and, balancing the statutory factors <u>de novo</u>, we agree with

7    the District Court that Starbucks failed to prove a likelihood of dilution.  We

8    therefore affirm.

9                                    **BACKGROUND**

10         We assume familiarity with the underlying facts and long procedural

11   history of the case, which are set forth in our previous opinions, <u>Starbucks Corp.</u>

12   <u>v. Wolfe's Borough Coffee, Inc.</u>, 477 F.3d 765 (2d Cir. 2007) ("<u>Starbucks II</u>"), and

13   <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97 (2d Cir. 2009)

14   ("<u>Starbucks IV</u>").  We recount them here only as necessary to explain our

15   disposition of this appeal.[1]

16         As of 2005, when the bench trial occurred, Starbucks had grown from a

17   single coffee shop in Seattle in 1971 to a singularly prominent global purveyor of

18   specialty coffee and coffee products, with 8,700 retail locations worldwide and

19   revenues of $5.3 billion for fiscal year 2004.  Starbucks U.S. Brands is the owner,

20   and Starbucks Corporation a licensee, of at least 56 valid United States trademark

21   registrations that include the Starbucks Marks.  The Starbucks Marks are

---

[1] The following factual recitation reflects the parties' presentation to the District
Court.

1    displayed on signs and at multiple locations in each Starbucks store, as well as on

2    the Starbucks website.

3         Starbucks has devoted substantial time, effort, and money to advertising

4    and promoting the Starbucks Marks.  From fiscal year 2000 to 2003, Starbucks

5    spent over $136 million on advertising, promotion, and related marketing

6    activities, essentially all of which featured the Starbucks Marks.  Starbucks

7    actively polices the Starbucks Marks, demanding that infringing uses be

8    terminated and, where necessary, commencing litigation.[2]  Well before Black Bear

9    used the term "Charbucks" as part of any product name, the Starbucks Marks

10   were "famous" within the meaning of the FTDA.  See 15 U.S.C. § 1125(c)(2)(A).

11        Black Bear manufactures and sells roasted coffee beans and related goods

12   via mail and internet order, at a limited number of New England supermarkets,

13   and at a single New Hampshire retail outlet.  In 1997 Black Bear developed a

14   coffee blend named "Charbucks Blend"; it now sells a dark-roast coffee called

15   "Mister Charbucks" or "Mr. Charbucks."  When Black Bear began manufacturing

16   coffee using the Charbucks Marks, it was aware of the Starbucks Marks.  One of

---

[2] Three weeks after oral argument before this Court, Black Bear moved for leave
to file a supplemental statement concerning injunctive relief.  The statement
represented that Black Bear's counsel had learned that Starbucks had permitted
another coffee roaster to market a "Charbucks" coffee.  Black Bear noted that this
new information would bear on whether injunctive relief should be granted,
were we to reverse the District Court.  Starbucks opposed the motion, stating that
the letter indicating that Starbucks would permit the other roaster to market
Charbucks coffee was sent in error and that, after Black Bear filed its motion,
Starbucks had sent a cease and desist letter to the other roaster.  Because we
affirm the judgment of the District Court, we deny Black Bear's motion for leave
to file as moot and accept the stipulated fact that Starbucks polices its marks.

1    the reasons Black Bear used the term "Charbucks" was the public perception that

2    Starbucks roasted its beans unusually darkly.

3        Soon after Black Bear began to sell Charbucks Blend, Starbucks demanded

4    that it cease using the Charbucks Marks.  Black Bear nevertheless continued to

5    sell coffee under the Charbucks Marks, and in 2001 Starbucks started this action

6    claiming, among other things, trademark dilution in violation of 15 U.S.C. §§

7    1125(c), 1127.[3]

8        The District Court held a two-day bench trial in March 2005.  At trial, two

9    matters of significance to this appeal occurred.  First, Black Bear's founder, James

10   O. Clark III, testified that the name "Charbucks" had previously been used

11   during "the coffee wars in Boston between Starbucks and the Coffee

12   Connection," a Boston-based company.[4]  Second, Starbucks introduced the

13   testimony of Warren J. Mitofsky, a scientist in the field of consumer research and

14   polling.  Mitofsky explained the results of a telephone survey he had conducted

15   of six hundred participants, designed to be representative of the United States

---

[3] Starbucks also asserted claims of trademark infringement in violation of 15 U.S.C. § 1114(1); unfair competition in violation of 15 U.S.C. § 1125(a); trademark dilution in violation of New York General Business Law § 360-*l*; deceptive acts and business practices and false advertising in violation of New York General Business Law §§ 349, 350; and unfair competition in violation of New York common law.  All of these claims were dismissed during the course of this suit and are not the subject of this appeal.

[4] The Coffee Connection apparently no longer exists as an independent company. See Starbucks Plans to Acquire Coffee Connection, New York Times (March 16, 1994), available at http://www.nytimes.com/1994/03/16/business/company-news-starbucks-plans-to-acquire-coffee-connection.html.

1    population.  The survey found that when asked, "What is the first thing that

2    comes to your mind when you hear the name 'Charbucks,' spelled C-H-A-R-B-U-

3    C-K-S?," 30.5 percent of participants answered "Starbucks," while 9 percent

4    answered "coffee."[5]  When the participants were asked, "Can you name any

5    company or store that you think might offer a product called 'Charbucks'?," 3.1

6    percent responded "Starbucks," and another 1.3 percent responded "coffee

7    house."[6]  Mitofsky concluded that "[t]he number one association of the name

8    'Charbucks' in the minds of consumers is with the brand 'Starbucks.'"

9    Commenting on the scope of his survey, Mitofsky also stated: "[I]f you want to

10    know the reaction to the name Charbucks, then the telephone is perfectly

11    adequate.  If you want to measure the reaction or the familiarity with other visual

12    cues, then it's not the right method."  Starbucks IV, 588 F.3d at 104.

13        In December 2005 the District Court ruled in favor of Black Bear and

14    dismissed Starbucks' complaint.  See Starbucks Corp. v. Wolfe's Borough Coffee,

15    Inc., No. 01 Civ. 5981, 2005 WL 3527126 (S.D.N.Y. Dec. 23, 2005) ("Starbucks I").

16    The District Court determined that there was neither actual dilution, which

---

[5] Other common responses included "barbeque" or "charcoal" (7.9 percent); "restaurant" or "grill" (7.5 percent); "meat," "steak," or "hamburger" (4.6 percent); and "money" (3.9 percent).

[6] More popular responses to this second question included: "grocery store" (18.3 percent); "discount store" (16.9 percent); "restaurant" (7.0 percent); "department store" (4.8 percent); and "hardware store" or "home improvement store" (3.7 percent).

1   would establish a violation of federal trademark law,[7] nor a likelihood of

2   dilution, which would establish a violation of New York trademark law.

3          Starbucks appealed.  While the appeal was pending, Congress passed the

4   Trademark Dilution Revision Act of 2006 ("TDRA"), which amended the FTDA

5   to clarify that the owner of a famous mark seeking an injunction need prove only

6   that the defendant's mark "is likely to cause dilution . . . of the famous mark,

7   regardless of the presence or absence of actual or likely confusion, of competition,

8   or of actual economic injury."  15 U.S.C. § 1125(c)(1).  The TDRA further

9   redefined "dilution by blurring" as "association arising from the similarity

10  between a mark or trade name and a famous mark that impairs the

11  distinctiveness of the famous mark."  Id. § 1125(c)(2)(B).  The statute provides the

12  following direction to courts:

13               In determining whether a mark or trade name is likely
14               to cause dilution by blurring, the court may consider all
15               relevant factors, including the following:
16
17                    (i) The degree of similarity between the mark or
18                    trade name and the famous mark.
19
20                    (ii) The degree of inherent or acquired
21                    distinctiveness of the famous mark.
22
23                    (iii) The extent to which the owner of the famous
24                    mark is engaging in substantially exclusive use of
25                    the mark.

26

---

[7] At the time, federal law provided: "The owner of a famous mark shall be entitled . . . to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark . . . ."  15 U.S.C. § 1125(c)(1) (1999) (amended 2006) (emphasis added).

1                       (iv) The degree of recognition of the famous
2                       mark.
3
4                       (v) Whether the user of the mark or trade name
5                       intended to create an association with the famous
6                       mark.
7
8                       (vi) Any actual association between the mark or
9                       trade name and the famous mark.
10
11 Id. In light of this change in the governing law, we vacated the judgment of the

12 District Court and remanded for further proceedings. Starbucks II, 477 F.3d at

13 766.

14         On remand, after further briefing, the District Court again ruled in Black

15 Bear's favor for substantially the same reasons set forth in its earlier opinion, but

16 it also analyzed the federal dilution claim in light of the TDRA. See Starbucks

17 Corp. v. Wolfe's Borough Coffee, Inc., 559 F. Supp. 2d 472, 475–79 (S.D.N.Y. 2008)

18 ("Starbucks III"). In particular, the District Court considered the six non-

19 exclusive factors listed in the statute and made the following findings: (1) the

20 marks were minimally similar, which the court deemed alone sufficient to defeat

21 Starbucks' claim; (2) (a) the distinctiveness of the Starbucks Marks, (b) the

22 exclusivity of their use by Starbucks, and (c) their high degree of recognition, all

23 weighed in favor of Starbucks; (3) the intent factor weighed in Black Bear's favor

24 because Black Bear's intent to create an association with the Starbucks Marks did

25 not constitute bad faith; and (4) evidence from Mitofsky's survey was

26 "insufficient to make the actual confusion factor weigh in [Starbucks'] favor to

27 any significant degree." Id. at 477–78 (quotation marks omitted). Balancing all

28 six factors, the District Court held that the record was "insufficient to

1    demonstrate the requisite likelihood that the association arising from the

2    similarity of the core terms is likely to impair the distinctiveness of Starbucks'

3    mark, and Plaintiff is not entitled to injunctive relief under that statute." Id. at

4    478.

5    　　　　Starbucks appealed again, arguing that the District Court erred in finding

6    that the Charbucks Marks are not likely to dilute the Starbucks Marks.  In

7    Starbucks IV, we examined the District Court's findings as to the first, fifth, and

8    sixth factors, as well as its balancing of the statutory factors that bear on the

9    likelihood of dilution by blurring.  We held that "the District Court did not

10   clearly err in finding that the Charbucks Marks were minimally similar to the

11   Starbucks Marks," 588 F.3d at 106, because the context of the Charbucks Marks

12   (on Black Bear's packaging, on its website, and in the phrases "Charbucks Blend"

13   and "Mister Charbucks") differentiated them from the famous marks.  We

14   concluded, however, that "the District Court erred to the extent it required

15   'substantial' similarity between the marks," id. at 107, and we suggested that the

16   District Court had overemphasized the similarity factor.  In particular, we stated

17   that the inclusion of "the degree of similarity" as only one of six factors in the

18   revised statute indicates that even a low degree of similarity would not

19   categorically bar a dilution-by-blurring claim.  Id. at 108.

20   　　　　Turning to the fifth and sixth factors—intent to associate and actual

21   association—we held that the District Court had erred by requiring "bad faith" to

22   find that the intent to associate factor favored Starbucks.  Id. at 109 (quotation

23   marks omitted).  Noting the survey results, which demonstrated some degree of

association between "Charbucks" and "Starbucks," we also held that the District Court erred by relying on evidence supporting the absence of "actual <u>confusion</u>" to conclude that the actual <u>association</u> factor did not weigh in Starbucks' favor "to any significant degree." <u>Id.</u> (quotation marks omitted).  The absence of actual or likely confusion, we reasoned, does not bear directly on whether dilution is likely.  <u>Id.</u>

Emphasizing that the analysis of a dilution by blurring claim must ultimately focus on "whether an <u>association</u>, arising from the similarity between the subject marks, 'impairs the distinctiveness of the famous mark,'" <u>id.</u> (quoting 15 U.S.C. § 1125(c)(2)(B)), we vacated the judgment of the District Court and remanded for reconsideration of the claim in light of our discussions of the first, fifth, and sixth statutory factors, <u>id.</u> at 109–10.

In its opinion and order following that remand, <u>see</u> <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, No. 01 Civ. 5981, 2011 WL 6747431 (S.D.N.Y. Dec. 23, 2011) ("<u>Starbucks V</u>"), the District Court recognized that the second through fifth statutory factors[8] favored Starbucks.  <u>Id.</u> at *3 (citing <u>Starbucks IV</u>, 588 F.3d at 106–10).  But the court again found that the first factor (the similarity of the marks) favored Black Bear because the marks were only minimally similar when presented in commerce—that is, when the Charbucks Marks are viewed on the

---

[8] For convenience, we repeat those factors here: (ii) the distinctiveness of the Starbucks Marks; (iii) the exclusivity of Starbucks' use of its marks; (iv) the high degree of recognition of the Starbucks Marks; and (v) Black Bear's intent to associate the Charbucks Marks with the Starbucks Marks.

1  packaging, which includes the phrases "Charbucks Blend" or "Mister

2  Charbucks."  Id.

3       As for the sixth factor (actual association), the District Court acknowledged

4  that the results of the Mitofsky survey "constitute evidence of actual association,"

5  id. at *4, but it then significantly discounted those results on the ground that the

6  survey inquired into associations only with the isolated word "Charbucks" and

7  failed to present the Charbucks Marks in full context, id.  The court also

8  compared the survey results in this case with those in other cases.  Here, it noted,

9  only 30.5 percent of respondents associated "Charbucks" with "Starbucks," while

10  in other trade dilution cases 70 percent to 90 percent of survey respondents

11  associated the relevant marks.  Id.  The District Court also compared the 3.1

12  percent of respondents who thought a product called "Charbucks" would be

13  made by Starbucks to the 28 percent of respondents who made a similar origin

14  association in a Ninth Circuit trademark dilution case.  Id. (citing Jada Toys, Inc.

15  v. Mattel, Inc., 518 F.3d 628, 636 (9th Cir. 2008)).  With the benefit of these

16  comparisons, the District Court found that the actual association factor weighs

17  "no more than minimally" in Starbucks' favor.  Id.

18       In evaluating the likelihood of dilution, the District Court emphasized the

19  "association" and "similarity" factors.  Citing the TDRA's definition of dilution

20  by blurring as "association arising from the similarity between a mark or trade

21  name and a famous mark that impairs the distinctiveness of the famous mark,"

22  the District Court explained that "[t]he statutory language leaves no doubt" that

23  these two factors are "obviously important."  Id. at *5 (quoting 15 U.S.C. §

1125(c)(2)(B). After balancing all six factors, the District Court held that Starbucks had failed to meet its burden of showing that it was entitled to injunctive relief:

> [T]he Charbucks marks are only weakly associated with the minimally similar Starbucks marks and, thus, are not likely to impair the distinctiveness of the famous Starbucks marks. In other words, [Starbucks] has failed to carry its burden of proving that [Black Bear's] use of its marks, as evidenced on the record before the Court, is likely to cause dilution by blurring.

Id. at *6.

On appeal, Starbucks challenges both the factual findings of minimal similarity and weak association and the conclusion that it failed to demonstrate a likelihood of dilution.

## DISCUSSION

A.    History of Federal Trademark Dilution Law

"Federal law allows the owner of a 'famous mark' to enjoin a person from using 'a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark.'" Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 110–11 (2d Cir. 2010) (quoting 15 U.S.C. § 1125(c)(1)). Dilution by blurring is "the whittling away of the established trademark's selling power and value through its unauthorized use by others." Id. at 111 (alteration and quotation marks omitted).

Dilution by blurring as a cause of action was championed initially by Frank Schechter in a 1927 law journal article. See Frank I. Schechter, The Rational Basis of Trademark Protection, 40 Harv. L. Rev. 813 (1927). Schechter argued that a

1    mark both symbolizes existing good will and can <u>generate</u> good will.  <u>Id.</u> at 819

2    ("The mark actually <u>sells</u> the goods.  And, self-evidently, the more distinctive the

3    mark, the more effective is its selling power.").  So-called "[t]rademark pirates,"

4    Schechter explained, stopped short of infringing marks in favor of using marks

5    similar to well-known marks on non-competing goods, such as Kodak bicycles,

6    Rolls-Royce radio tubes, and Beech-Nut cigarettes.  <u>Id.</u> at 825.  Schechter

7    described the injury in these cases as

8            the gradual whittling away or dispersion of the identity
9            and hold upon the public mind of the mark or name by
10           its use upon non-competing goods.  The more
11           distinctive or unique the mark, the deeper is its impress
12           upon the public consciousness, and the greater its need
13           for protection against vitiation or dissociation from the
14           particular product in connection with which it has been
15           used.
16
17   <u>Id.</u>  Somewhat more vividly in later congressional testimony, Schechter warned

18   that "if you allow Rolls Royce restaurants and Rolls Royce cafeterias, and Rolls

19   Royce pants, and Rolls Royce candy, in 10 years you will not have the Rolls

20   Royce mark any more."  Trade-Marks: Hearings Held Before the H. Comm. on

21   Patents, 72d Cong. 15 (1932) (statement of Frank I. Schechter), <u>quoted in</u> Walter J.

22   Derenberg, <u>The Problem of Trademark Dilution and the Antidilution Statutes</u>, 44

23   Cal. L. Rev. 439, 449 (1956).

24         Heeding Schechter's warning, some States passed antidilution statutes.

25   <u>See</u> 4 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> §

26   24:77 (4th ed. 2012) ("McCarthy"); Derenberg, <u>supra</u>, at 452–61.  For example, the

27   legislative history of New York's antidilution statute "disclosed a need for

-13-

1    legislation to prevent such 'hypothetical anomalies' as 'Dupont shoes, Buick

2    aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth.'"

3    <u>Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.</u>, 875 F.2d 1026, 1031 (2d

4    Cir. 1989) (quoting 1954 N.Y. Legis. Ann. 49–50).  But the predictable result of

5    these desultory efforts by various States to pass antidilution laws was an uneven

6    regulatory patchwork of protection.  <u>See</u> S. Rep. No. 100-515, at 7 (1988),

7    <u>reprinted</u> <u>in</u> 1988 U.S.C.C.A.N. 5577, 5583.  Congress first addressed that problem

8    in 1996, when it enacted the FTDA, which entitled any owner of a famous mark

9    "to an injunction against another person's commercial use in commerce of a mark

10    or trade name, if such use begins after the mark has become famous and causes

11    dilution of the distinctive quality of the mark . . . ."  15 U.S.C. § 1125(c)(1) (1996).[9]

12        In 2003, however, the Supreme Court decided <u>Moseley v. V Secret</u>

13    <u>Catalogue, Inc.</u>, 537 U.S. 418 (2003), which held that the FTDA required a plaintiff

14    to prove "actual dilution," not simply a "likelihood of dilution," in order to

15    establish a trademark dilution claim.  <u>Id.</u> at 433.  In response, the International

16    Trademark Association ("INTA"), a primary advocate for the FTDA, supported a

17    congressional amendment to abrogate <u>Moseley</u>.  The proposed amendment,

---

[9] The legislative history of a failed earlier version of the FTDA strongly suggests that the law was "specifically intended" to come into play "where the unauthorized use by others, on dissimilar products for which the trademark is not registered, dilutes the distinctiveness of [a] famous work."  Sen. Judiciary Comm. Rep. on S. 1883, S. Rep. No. 100-515, at 7 (citing examples of Kodak pianos and Buick aspirin); <u>see</u> McCarthy § 24:96 ("[T]o the extent that the language is the same," the Senate Judiciary Report of 1988 "provide[s] useful legislative history for interpreting the [FTDA] as well as parts of its successor, the [TDRA]").

1    which eventually became the TDRA, provided that plaintiffs need prove only a

2    likelihood of dilution and, thus, allowed famous mark owners to "prevent

3    dilution at its incipiency" and not force them to "wait until the harm has

4    advanced so far that . . . the recognition of the mark . . . is permanently impaired"

5    in order to sue.  Committee Print to Amend the Federal Trademark Dilution Act:

6    Hearing Before the H. Subcomm. on Courts, the Internet, and Intellectual

7    Property of the H. Comm. on the Judiciary, 108th Cong. 10 (2004) ("2004

8    Hearing") (statement of Jacqueline A. Leimer, INTA); see McCarthy § 24:96.  At

9    congressional hearings in 2004 and 2005, witnesses criticized the Moseley

10    decision as "essentially sa[ying] you have got to wait until the horse is gone, and

11    then the only thing you can do is close the barn door."  Trademark Dilution

12    Revision Act of 2005: Hearing on H.R. 683 Before the H. Subcomm. on Courts, the

13    Internet, and Intellectual Property of the H. Comm. on the Judiciary, 109th Cong.

14    18 (2005) ("2005 Hearing") (statement of Mark A. Lemley, William H. Neukom

15    Prof. of Law, Stanford Univ.); see also 2004 Hearing, at 44, 46–47 (statement of

16    David C. Stimson, Chief Trademark Counsel, Eastman Kodak Company).

17         Although a number of witnesses testified at the hearings, the hearing

18    statements of Anne Gundelfinger, then-President of the INTA, are considered a

19    primary source of the legislative history of the TDRA.  See McCarthy § 24:96.

20    During her testimony, Gundelfinger explained that the association between

21    marks needed only to be "likely to impair the distinctiveness of the famous mark

22    in the marketplace."  2005 Hearing, at 12.  Gundelfinger also proposed a list of six

23    factors that would "go to the question of whether the famous mark's

1    distinctiveness in the marketplace will be blurred by the junior use." Id. at 14.

2    She explained that courts will "need to balance all of these factors, as well as any

3    others relevant to the question of blurring, in order to make a determination as to

4    whether there is a likelihood of dilution by blurring." Id.

5        President Bush signed the TDRA into law in 2006.

6        B.    Standard of Review

7        After a bench trial on a claim for trademark dilution by blurring, where the

8    district court evaluates and balances the factors listed in the TDRA, we review

9    the court's determinations as to each factor for clear error and its balancing of

10    those factors de novo. See Tiffany, 600 F.3d at 101; Starbucks IV, 588 F.3d at 105.[10]

11    Accordingly, the District Court's factual findings regarding each factor bearing

12    on the likelihood of trademark dilution by blurring will not be disturbed unless

13    "on the entire evidence [we are] left with the definite and firm conviction that a

14    mistake has been committed," United States v. Oehne, 698 F.3d 119, 121 (2d Cir.

15    2012) (quotation marks omitted), while the balancing of those factors to

16    determine the likelihood of dilution is a legal exercise subject to de novo review.

---

[10] We employ the same standard here that we use in the context of trademark
infringement, where a district court evaluates and then balances the eight factors
set forth in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.
1961), to determine whether there is a likelihood of confusion. See, e.g., Star
Indus. v. Bacardi & Co., 412 F.3d 373, 384 (2d Cir. 2005). The statutory factors
enumerated in § 1125(c)(2)(B) are similar in kind to the Polaroid factors. For
example, both lists include the "similarity between" the two marks; "strength" of
the mark in Polaroid is akin to "distinctiveness" in § 1125; and "actual confusion"
in Polaroid mirrors "actual association" in § 1125. See Polaroid, 287 F.2d at 495.

1    To determine how to conduct the balancing, we look first to the language of the

2    statute.  See Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 48 (2d Cir. 2012).

3         Under § 1125(c)(1), the plaintiff must show the defendant's "use of a mark

4    . . . in commerce that is likely to cause dilution by blurring . . . of the famous

5    mark, regardless of the presence or absence of actual or likely confusion, of

6    competition, or of actual economic injury."  Section 1125(c)(2)(B) defines

7    "dilution by blurring" as "association arising from the similarity between a mark

8    . . . and a famous mark that impairs the distinctiveness of the famous mark."  The

9    statute then instructs that, "[i]n determining whether a mark . . . is likely to cause

10    dilution by blurring," the court "may consider all relevant factors," including the

11    six enumerated factors.

12         We previously have declined to treat the factors pertinent to a trademark

13    dilution analysis as an inflexible, mechanical test, suggesting instead that the

14    importance of each factor will vary with the facts.  Nabisco, Inc. v. PF Brands,

15    Inc., 191 F.3d 208, 227–28 (2d Cir. 1999), abrogated on other grounds by Moseley,

16    537 U.S. at 433.  Accordingly, we need not consider all six statutory factors listed

17    in 15 U.S.C. § 1125(c)(2)(B)(i)–(vi) if some are irrelevant to the ultimate question;

18    nor are we limited to those six factors.  See Louis Vuitton Malletier S.A. v. Haute

19    Diggity Dog, LLC, 507 F.3d 252, 266 (4th Cir. 2007) ("Not every factor will be

20    relevant in every case, and not every blurring claim will require extensive

21    discussion of the factors.").  Instead, we employ a "cautious and gradual

22    approach," which favors the development of a nonexclusive list of trademark

23    dilution factors over time.  Nabisco, 191 F.3d at 217.

-17-

C.    Factual Findings: The Statutory Factors

On appeal, Starbucks challenges two of the District Court's findings: (1) that there is only a minimal degree of similarity between the Starbucks Marks and the Charbucks Marks; and (2) that Starbucks demonstrated only a weak association between the marks.  The District Court did not clearly err with regard to either finding.

1.    Degree of Similarity

In Starbucks IV we held that "[w]ith respect to the first factor—the degree of similarity between the marks—the District Court did not clearly err in finding that the Charbucks Marks were minimally similar to the Starbucks Marks."  588 F.3d at 106.  We highlighted the difference between the Starbucks Marks and Charbucks Marks when the latter are placed in the context of Black Bear's packaging and the word "Charbucks" is incorporated into the phrases "Charbucks Blend" and "Mister Charbucks."  Id.  "The law of the case ordinarily forecloses relitigation of issues expressly or impliedly decided by the appellate court."  United States v. Quintieri, 306 F.3d 1217, 1229 (2d Cir. 2002) (quotation marks omitted).  Although not binding, the doctrine "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"  Ali v. Mukasey, 529 F.3d 478, 490 (2d Cir. 2008) (quoting United States v. Tenzer, 213 F.3d 34, 39 (2d Cir. 2000)).  Starbucks advances no compelling reason for us to revisit our ruling on the issue of similarity.  It urges

-18-

1    that the holding in <u>Starbucks IV</u> applied only to our "likelihood of confusion"

2    analysis, and that the District Court erred by considering the contexts in which

3    consumers encounter the Charbucks Marks.[11]  We reject such a crabbed view of

4    the holding and adhere to our prior ruling that the District Court did not clearly

5    err in finding minimal similarity.

6                2.    <u>Actual Association</u>

7            Starbucks next contends that the District Court's finding that actual

8    association "weighs no more than minimally" in Starbucks' favor, <u>Starbucks V</u>,

9    2011 WL 6747431, at *4, was error for two reasons.  First, Starbucks argues, Black

10   Bear's admitted intent to create an association—the fifth statutory factor—raises a

11   "presumption of association," or at least is strong evidence of actual

12   association—the sixth statutory factor.  Second, it argues that the District Court

13   improperly discounted the Mitofsky survey evidence, which, in Starbucks' view,

14   proves a high degree of actual association.  We reject both arguments.

15               a.    <u>Intent to Create an Association</u>

16           As an initial matter, an intent to create an association is a separate factor

17   under the TDRA and does not constitute <u>per se</u> evidence that the actual

18   association factor weighs in favor of the owner of the famous mark.[12]  In support

---

[11] At oral argument, Starbucks' counsel conceded that our earlier decision on
minimal similarity is the law of the case.  Oral Arg. Tr. 10:15-19.

[12] Black Bear contends that this argument was waived below.  We disagree.
Starbucks sufficiently preserved the argument.  <u>See</u> Joint App'x 1621–22
(Starbucks' Opening Brief on Second Remand) ("[W]here, as here, there has been
a judicial determination of an intent to associate, the logical conclusion is that
defendant's intended result was achieved (e.g., that 'actual association' has
occurred).").

of its argument to the contrary, Starbucks quotes McCarthy's treatise, which

states, "If the junior [user] intended to create an association, the law may assume

that it succeeded." McCarthy § 24:119. Starbucks similarly relies on Federal

Express Corp. v. Federal Espresso, Inc., 201 F.3d 168 (2d Cir. 2000), a dilution case

in which we stated that the trier of fact "may well find that the marks are of

sufficient similarity so that, in the mind of the consumer, the junior mark will

conjure an association with the senior, especially in light of the testimony of

[Federal Espresso's founder] that she chose the name Federal Espresso, in part,

precisely because it would call to mind Federal Express." Id. at 177 (quotation

marks omitted).

Both Federal Espresso and McCarthy's treatise acknowledge the

importance of the intent factor in determining likelihood of dilution. This makes

sense, as district courts must evaluate whether a junior mark is "likely to cause"

"association arising from the similarity" between the marks "that impairs the

distinctiveness of the famous mark," 15 U.S.C. §§ 1125(c)(1), (c)(2)(B), and the

intent to associate may bear directly on the likelihood that the junior mark will

cause such an association.

That said, "we interpret statutes to give effect, if possible, to every clause

and word and to avoid statutory interpretations that render provisions

superfluous." United States v. Al Kassar, 660 F.3d 108, 124–25 (2d Cir. 2011)

(quotation marks omitted). Adopting Starbucks' presumption argument would

effectively merge the intent to associate and the actual association factors, by

making the former determinative of the latter, rather than treating them as

1    distinct but related considerations.  We therefore conclude that the District Court

2    did not clearly err in finding that Clark's testimony concerning the origin of the

3    Charbucks Marks was not an "admission" of actual association and that his

4    intentions were not definitive proof of an actual association between the marks.

5                    b.    Mitofsky Survey

6          Nor did the District Court err when it discounted the Mitofsky survey

7    evidence because the survey measured only how respondents reacted to the

8    isolated word "Charbucks," rather than to the Charbucks Marks in context, and

9    because the share of respondents who indicated an association between the

10   marks was "relatively small."  Starbucks V, 2011 WL 6747431, at *4.  We arrive at

11   this conclusion for two reasons.

12         First, it coheres with our decision in Starbucks IV, in which we discerned

13   no clear error in the District Court's consideration of context—including the

14   addition of "Mister" or "Blend" to "Charbucks" and Black Bear's packaging—in

15   assessing the marks' similarity, as consumers are likely to experience the product

16   only in the context of those full phrases and Black Bear's packaging or website.

17   Starbucks IV, 588 F.3d at 106.  In our analysis of Starbucks' infringement claim,

18   we similarly determined that the District Court did not clearly err when it found

19   (1) that the survey failed to demonstrate significant actual confusion,

20   "[p]articularly in light of the fact that the survey was administered by telephone

21   and did not present the term 'Charbucks' in the context in which Black Bear used

22   it," id. at 117, and (2) that the survey should have examined the effects of "a

23   hypothetical coffee named either 'Mister Charbucks' or 'Charbucks Blend'" on

1    the respondents' impressions of Starbucks coffee as a measure of dilution by

2    tarnishment, id. at 110.

3          Second, our conclusion also comports with our prior precedents and other

4    cases unrelated to Starbucks.  In Playtex Products, Inc. v. Georgia-Pacific Corp.,

5    390 F.3d 158 (2d Cir. 2004), a case interpreting the pre-revision FTDA, we held

6    that the results of a consumer survey showing an association between the marks

7    "Moist-Ones" and "Wet Ones" were inadmissible as evidence of actual dilution

8    because the defendant's product was "presented and packaged" as "Quilted

9    Northern Moist-Ones."  Id. at 168 (emphasis added).  District courts within our

10   Circuit have applied the same reasoning in evaluating surveys in the

11   infringement context.  See, e.g., THOIP v. Walt Disney Co., 690 F. Supp. 2d 218,

12   235–40 (S.D.N.Y. 2010); Juicy Couture, Inc. v. L'Oreal USA, Inc., No. 04 Civ. 7203,

13   2006 WL 1012939, at *25–27 (S.D.N.Y. Apr. 19, 2006); WE Media, Inc. v. Gen. Elec.

14   Co., 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) ("Germane survey evidence should

15   make some effort to compare the impressions the marks have on potential

16   customers under marketplace conditions.").  In the dilution context, the language

17   of the FTDA, which requires a plaintiff to show the defendant's "use of a mark

18   . . . in commerce that is likely to cause dilution by blurring . . . ," 15 U.S.C. §

19   1125(c)(1) (emphasis added), clarifies that the way the defendant's mark is used

20   in commerce is central to the dilution inquiry.  As in Playtex, the District Court

21   was within its rights to conclude that the Mitofsky survey had limited probative

22   value because the defendant's marks were not presented to survey respondents

23   as they are actually "presented and packaged" in commerce.

1    Citing our decision in <u>Nabisco</u>, Starbucks nevertheless argues that

2    consumers are likely to hear and view the term "Charbucks" outside the context

3    of Black Bear's packaging and without the full phrases "Mister Charbucks" and

4    "Charbucks Blend."  <u>Nabisco</u>, 191 F.3d at 218 (rejecting an argument under the

5    pre-revision FTDA that packaging made two marks dissimilar, because many

6    consumers would see the marks outside of the packaging).  But Starbucks

7    presented no record evidence that "Charbucks" is ever read or heard in

8    isolation,[13] and in the absence of such evidence, we are not persuaded by the

9    argument.  To the contrary, as we noted in <u>Starbucks IV</u>, "it is unlikely that

10    'Charbucks' will appear to consumers outside the context of its normal use," 588

11    F.3d at 106, and "it was not clearly erroneous for the District Court to find that

12    the 'Mister' prefix or 'Blend' suffix lessened the similarity between the [marks],"

13    <u>id.</u> at 107.

14    Starbucks also challenges the District Court's finding that the association

15    between "Charbucks" and Starbucks was "relatively small."  It contends that the

16    Mitofsky survey in fact provided evidence of substantial actual association.  We

17    disagree.

18    It is true that in response to Mitofsky's question most probative of actual

19    association—"What is the FIRST THING that comes to your mind when you hear

20    the name 'Charbucks,' spelled C-H-A-R-B-U-C-K-S?"—30.5 percent of

21    respondents said "Starbucks," and 9 percent said "coffee."  Both of these

---

[13] Although the name "Mr. Charbucks" is presented in plain text on at least one page of Black Bear's website,  all other record uses of the Charbucks Marks situate them in Black Bear's distinct color scheme, font, and layout.

responses suggest an association between "Charbucks" and the Starbucks Marks.
In Jada Toys, 518 F.3d at 636, for example, the Ninth Circuit held that a survey
demonstrated actual association because it showed that 28 percent of
respondents thought Jada's product was made by Mattel when asked who they
thought produced the item.  Here, however, the equivalent question in
Mitofsky's survey was: "Can you name any company or store that you think
might offer a product called 'Charbucks'?"[14]  In response to that question
concerning source on the Mitofsky survey, however, only 3.1 percent of
respondents answered "Starbucks" and 1.3 percent answered "coffee house."
These percentages are far below that for the equivalent question in Jada Toys and
fail to demonstrate anything more than minimal actual association.[15]  See
Starbucks V, 2011 WL 6747431, at *4.

Ultimately, on this factor, we consider only whether the District Court
clearly erred when it found that the Mitofsky survey tilts the "actual association"
factor "no more than minimally in [Starbucks'] favor."  Id.  Had the Mitofsky

---

[14] Both that question and the question discussed in Jada Toys test not merely
association but also source confusion.  Source confusion may be probative of
association, because to confuse Charbucks with Starbucks, the word "Charbucks"
must call "Starbucks" to mind.  See Nabisco, 191 F.3d at 221 ("Confusion lessens
distinction.").

[15] Although some other respondents gave answers consistent with an association
with Starbucks—18.3 percent answered "grocery store," 16.9 percent answered
"discount store," 7 percent answered "restaurant," and 4.8 percent answered
"department store"—these responses are also consistent with other views of
what "Charbucks" could be, including meat or a charcoal grilling product, as 38.5
percent of respondents suggested.

1    survey presented the Charbucks Marks as they appear in commerce, we might

2    well conclude that the District Court erred.  But the word "Charbucks" was

3    presented outside of its marketplace context, and Starbucks, which bears the

4    burden of proof, see Jada Toys, 518 F.3d at 634, failed to show that this flaw did

5    not materially impact the survey results.  We therefore conclude that the record

6    supports the District Court's decision to discount the survey and consider the

7    actual association factor as weighing only minimally in Starbucks' favor.

8        D.    Balancing

9        We next balance the factors enumerated in § 1125(c)(2)(B), along with any

10    other factors that bear on a likelihood of dilution, de novo.[16]  In balancing these

11    factors, we are again mindful that the test is not an inflexible one, and that the

12    ultimate question is whether the Charbucks Marks are likely to cause an

13    association arising from their similarity to the Starbucks Marks, which impairs

14    the Starbucks Marks' tendency to identify the source of Starbucks products in a

15    unique way.

16        We have already affirmed the District Court's finding of minimal similarity

17    between the Charbucks Marks and the Starbucks Marks.  That finding weighs

18    heavily in Black Bear's favor.  Certainly, a plaintiff may show a likelihood of

19    dilution notwithstanding only minimal similarity.  But here, minimal similarity

20    strongly suggests a relatively low likelihood of an association diluting the senior

21    mark.  The statute itself emphasizes the similarity of marks.  See § 1125(c)(2)(B)

---

[16] See supra, Part B (discussing the applicable standard of review).  At oral
argument, both parties conceded that we may conduct this balancing ourselves.
See Oral Arg. Tr. 4:21-23 (Starbucks); Oral Arg. Tr. 14:19-22 (Black Bear).

1    (defining "dilution by blurring" as "association arising from the similarity

2    between a mark or a trade name and a famous mark that impairs the

3    distinctiveness of the famous mark" (emphasis added)).  Indeed, in Starbucks IV,

4    we stated that "'similarity' is an integral element in the definition of 'blurring'"

5    under the TDRA and suggested that, without any similarity, there could be no

6    dilution by blurring.  588 F.3d at 108–09.[17]

7         The next three factors—the degrees of distinctiveness, exclusive use, and

8    recognition—are features of the senior mark itself that do not depend on the use

9    of the junior mark.  "[T]he degree of distinctiveness of the senior mark has a

10   considerable bearing on the question whether a junior use will have a diluting

11   effect. . . . [T]he more distinctiveness the mark possesses, the greater the interest

12   to be protected."  Nabisco, 191 F.3d at 217.  There is no question that

13   "Starbucks"—an arbitrary mark as applied to coffee—is highly distinctive.  See

14   id. at 216.  Moreover, because, as the District Court found, the Starbucks Marks

15   are in substantially exclusive use, see Starbucks V, 2011 WL 6747431, at *3, "the

16   mark's distinctiveness is more likely to be impaired by the junior use," 2005

17   Hearing, at 14 (statement of Anne Gundelfinger).  Lastly, as 79 percent of

18   Mitofsky survey respondents were familiar with Starbucks, it is undisputed that

19   Starbucks constitutes a widely recognized mark, and that this factor favors

20   Starbucks.

_____

[17] Of course, in Starbucks IV, we rejected a per se or threshold requirement of "substantial similarity" between the marks at issue in federal dilution actions. 588 F.3d at 108–09.  In doing so, however, we did not suggest that a finding of minimal similarity could not be highly probative of the likelihood of dilution.

1    Although the three factors of distinctiveness, recognition, and exclusivity

2    favor Starbucks and bear to some degree on our assessment of the likelihood of

3    dilution by blurring, the more important factors in the context of this case are the

4    similarity of the marks and actual association.  We agree with the District Court

5    that the distinctiveness, recognition, and exclusive use of the Starbucks Marks do

6    not overcome the weak evidence of actual association between the Charbucks

7    and Starbucks marks.  To the contrary, viewed in light of Starbucks' fame, both

8    globally and among the Mitofsky survey participants more particularly, the fact

9    that more survey participants did not think of "Starbucks" upon hearing

10   "Charbucks" reinforces the District Court's finding that the marks are only

11   minimally similar, and therefore unlikely to prompt an association that impairs

12   the Starbucks Marks.  Likewise, although the distinctiveness and exclusive use of

13   the Starbucks Marks help Starbucks prove susceptibility to dilution by

14   association arising from similarity between the Charbucks and Starbucks marks,

15   they do not demonstrate that such an association is likely to arise, as Starbucks

16   needed to show to obtain an injunction.  Accordingly, these factors weigh only

17   weakly in Starbucks' favor.

18        In this case, we attribute a moderate amount of significance to the fifth

19   factor, intent to create an association.  Clark's testimony indicated that Black Bear

20   was capitalizing on an historic connection between the word "Charbucks" and

21   "Starbucks," which arose out of the so-called "coffee-wars" in Boston,

22   Massachusetts, see Starbucks IV, 588 F.3d at 111,  and that he "meant to evoke an

23   image of dark-roasted coffee of the type offered by Starbucks," Starbucks V, 2011

WL 6747431, at *5.  "[W]here, as here, the allegedly diluting mark was created

with an intent to associate with the famous mark," Starbucks IV, 588 F.3d at 109,

we agree with the District Court that this factor favors a finding of a likelihood of

dilution, see Starbucks V, 2011 WL 6747431, at *3, 5.

The final, disputed factor, actual association, is highly relevant to

likelihood of association.  In the analogous context of determining the "likelihood

of confusion" for trademark infringement claims, we have noted that "[t]here can

be no more positive or substantial proof of the likelihood of confusion than proof

of actual confusion," even though a showing of actual confusion is not necessary

to prevail on such a claim.  Savin Corp. v. Savin Grp., 391 F.3d 439, 459 (2d Cir.

2004) (quoting World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d

482, 489 (5th Cir. 1971)).  The same principle obtains with respect to proof of

actual association in dilution claims.  And as noted, the Mitofsky survey

demonstrated weak actual association, at best.

Weighing the factors above de novo, we agree with the District Court that

Starbucks did not demonstrate a likelihood of dilution by blurring.  Ultimately

what tips the balance in this case is that Starbucks bore the burden of showing

that it was entitled to injunctive relief on this record.  Because Starbucks'

principal evidence of association, the Mitofsky survey, was fundamentally

flawed, and because there was minimal similarity between the marks at issue, we

agree with the District Court that Starbucks failed to show that Black Bear's use

of its Charbucks Marks in commerce is likely to dilute the Starbucks Marks.

1                                 **CONCLUSION**

2           We have considered all of Starbucks' contentions on this appeal and have

3   concluded that they are without merit.  For the foregoing reasons, we AFFIRM

4   the judgment of the District Court.

5

6

7